Ronald H. JONES

v.

FENTON FORD, INC.

Civ. No. H–75–146.

United States District Court, D. Connecticut.

March 8, 1977.

**1330**

John I. Haymond, Hartford, Conn., for plaintiff.

John R. Fitzgerald, Howard, Kohn, Sprague & Fitzgerald, Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

CLARIE, Chief Judge.

The plaintiff, Ronald H. Jones, brought this action under Subchapter IV of the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. §§ 1981–91,[1] seeking statutory punitive damages and such equitable relief as the Court may deem appropriate. He claims that the defendant corporation, Fenton Ford, Inc. (Fenton Ford), an automobile dealership located in Enfield, Connecticut, violated the provisions of this Act by selling him a 1970 Chevrolet Bel Air sedan, identification # 156690 T137103, without disclosing at the time of the sale that the vehicle's total mileage as reflected by the odometer was inaccurate, a fact which was then within the defendant's possession. While the defendant does not deny these basic facts, it asserts that the dealership's failure to inform the plaintiff of the inaccuracy of the odometer reading resulted from an innocent clerical error, and not from an "intent to defraud," which the statute requires. The defendant filed a counterclaim for the value of transmission repairs made on the subject automobile after its warranty had expired, plus storage and incidental service expenses.

The Court finds that the defendant sold the automobile to the plaintiff with a fraudulent intent sufficient to sustain liability under the statute. The defendant knew, or should have known, that the true mileage of the vehicle was indeterminate, and yet failed to so inform the plaintiff, as the statute requires. The contract of sale between the plaintiff and the defendant is rescinded, and damages are to be assessed in the total amount of $3521.70, plus $1200.00 in attorney's fees.

## FACTS

The defendant purchased a four-door 1970 Chevrolet Bel Air sedan on or about

---

1. In particular, § 408 of the Act, 15 U.S.C. § 1988, reads as follows:

"(a) Not later than 90 days after October 20, 1972, the Secretary shall prescribe rules requiring any transferor to give the following written disclosure to the transferee in connection with the transfer of ownership of a motor vehicle:
    (1) Disclosure of the cumulative mileage registered on the odometer.
    (2) Disclosure that the actual mileage is unknown, if the odometer reading is known to the transferor to be different from the number of miles the vehicle has actually travelled.
Such rules shall prescribe the manner in which information shall be disclosed under this section and in which such information shall be retained.

(b) It shall be a violation of this section for any transferor to violate any rules under this section or to knowingly give a false statement to a transferee in making any disclosure required by such rules."
Section 409(a) of the Act, 15 U.S.C. § 1989(a), reads:
"Any person who, with intent to defraud, violates any requirement imposed under this subchapter shall be liable in an amount equal to the sum of—
    (1) three times the amount of actual damages sustained or $1,500, whichever is the greater; and
    (2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with reasonable attorney fees as determined by the court."

April 15, 1974, as a trade-in from Henry Boulette, a resident of Enfield. At the time of this purchase, the car's odometer registered 28,619.9 miles, and this mileage was certified to in writing on an Odometer Mileage Statement (OM Statement) signed by Boulette.[2] (Plaintiff's Exhibit 2). Boulette testified that during the year in which he operated the car prior to selling it to the defendant the odometer and speedometer were "dead"; that is, both were entirely nonfunctioning. The recorded mileage was thus the same on the day Boulette sold the car as on the day he purchased it, approximately one year earlier.

At the time he sold the vehicle to Fenton Ford, Boulette made the fact of the odometer's defective condition known to the defendant's sales agent. This is confirmed by an "x" appearing in the box on the OM Statement, adjacent to the printed certification which reads:

"I further state that the actual mileage differs from the odometer reading for reasons other than odometer calibration error and that the actual mileage is unknown."

Boulette was granted a $997.00 trade-in allowance as consideration for his car (he testified that he had paid only $600.00 for it a year earlier).

Approximately seven months later, in November of 1974, the plaintiff came to the defendant's lot seeking a used car to be driven by his wife to and from her part-time job. After examining several other models not to their liking, the Joneses were shown the 1970 Bel Air, which was now priced at $1,895.00, sales tax excluded.[3] The plaintiff specifically questioned the salesman concerning the accuracy of the mileage shown on the odometer, and he was informed that to the salesman's knowledge the mileage was correct.[4] Mr. and Mrs. Jones testified that the salesman had told them that the car was "new on the lot and was going to be advertised as a special."

Based on the foregoing representations, in particular the representation as to low mileage, the Joneses purchased the 1970 Bel Air from Fenton Ford on November 27, 1974, at the asked-for price. The transaction was financed through an area bank. The OM Statement supplied to the Joneses by the dealership recited the current odometer reading (28,625 miles), but no check was placed in the box alongside the statement alerting the buyer to odometer irregularities. (Plaintiff's Exhibit 6). Thus, in purchasing the vehicle the Joneses were not put on notice in any way of the car's defective odometer. At the time of said purchase the odometer had been repaired and was functional, although Jones complained that the speedometer would not register speeds in excess of 45 miles per hour.[5] The odometer had obviously been repaired during the period in which it was in the defendant's custody.

Almost immediately upon leaving the dealership, the plaintiff and his wife encountered mechanical difficulty with the

---

2. As to the rules governing OM Statements, see 49 C.F.R. §§ 580.4 and 580.6.

3. With state sales tax and registration fee included, the total price was $2021.70. From this, $50.00 was deducted as a trade-in allowance for Jones' 1967 Ford Falcon.

4. The following account of the conversation was given by the plaintiff, Ronald Jones, in his courtroom testimony:

JONES: ". . . The odometer reading if I recall was quite low for . . . a car of 1970 vintage. I asked the question of [the defendant's salesman] if in fact the mileage was accurate, and I was given to understand that, yes, it was.

THE COURT: What did he say? You say "given to understand"—that's important. What did he say to you?

JONES: Well his exact words, I think . . . . .

THE COURT: Your best recollection.

JONES: Your Honor, I think when I asked the question he said, "As far as I know, the mileage is correct"—"To my knowledge the mileage is correct, as stated."

The defendant's salesman, Dave Powers, did not testify at trial.

5. The plaintiff listed this malfunction in a complaint filed with the Connecticut Department of Motor Vehicles.

automobile.[6] Over the course of the ensuing month it became necessary to return the car for repairs on at least four occasions, and possibly on as many as six. In each instance, the necessary repairs were effected and the car was returned to the Joneses. Finally, somewhat more than a month after the date of purchase, the car's transmission failed as Mrs. Jones was driving home. The car was then towed to the defendant's lot, where it has since remained.

The plaintiff was informed on the occasion of this final breakdown that his 30-day warranty on the car had expired, and that he would therefore be required to pay the repair costs. The testimony is in conflict as to exactly what statements were made at this time. The defendant claims that the plaintiff orally agreed to have the repairs undertaken at his own expense. The plaintiff insists that, while he requested that the automobile should be repaired, he made it clear that he had no intention of undertaking any payment for such repairs.

About this time, the plaintiff met Henry Boulette, the prior owner of the automobile, who informed Jones of the defect in the odometer during the year in which he owned the car.[7] The plaintiff testified that he thereupon returned to the dealership and demanded that the original sales transaction be rescinded. The defendant denies that the plaintiff ever made such a demand. Eventually, the plaintiff received an invoice for the transmission repairs, which he refused to pay. The defendant has not returned the automobile, claiming a lien for the transmission repairs, and now also seeks to charge the plaintiff for winterizing and storage.

The plaintiff claims that lost use of the 1970 Bel Air caused Mrs. Jones to quit her part-time job,[8] and that on two occasions the family was forced to rent an automobile when their principal vehicle, a Ford Pinto, broke down and required repairs. This added expense would have been unnecessary, Jones asserts, if the Bel Air had been operational. Furthermore, Jones claims that he has been required by the financing bank to maintain fire, theft and collision coverage on the Bel Air while it has been on Fenton Ford's lot, and to continue the principal and interest payments on the installment note to the bank.

The defendant admits the essential facts of the plaintiff's case, but asserts that the dealership's failure to inform the plaintiff of the defective history of the car's odometer resulted from an innocent clerical error. Specifically, it is asserted that one Chris Lambert, an inexperienced office worker then employed by Fenton Ford, placed the original OM Statement signed by Henry Boulette in a folder pertaining to another automobile. Thus, when other employees subsequently referred to the file on the 1970 Bel Air, they were not put on notice that the car's mileage was indeterminate, and innocently represented that the mileage shown on the odometer was, to the best of their knowledge, correct. Chris Lambert did not testify at the trial.

The Court must decide on these facts whether or not an automobile dealership may be held liable under the Act—which requires an "intent to defraud" in a civil action for damages—if it has not been proved that the defendant acted with actual knowledge.

**6.** The plaintiff testified that shortly after leaving the dealership he stopped at a filling station for gas. The car would not start again after being filled, and it was necessary to have it towed back to the defendant's lot for repairs.

**7.** It is not entirely clear under what circumstances Jones came into contact with Boulette, although Mrs. Jones' testimony seemed to indicate that he operated the tow truck which

returned the automobile to the defendant's premises after its transmission failure.

**8.** Lost wages were not included as an item of damages in the complaint. The Court excluded testimony which the plaintiff offered at trial to establish the value of lost wages, on the grounds that such damages are too remote to be recoverable under the Act.

## DISCUSSION OF THE LAW

### (a) *Liability*

The reported cases do not decide the question of whether or not the "intent to defraud" requirement in § 409 of the Motor Vehicle Information and Cost Savings Act (MVICS Act), 15 U.S.C. § 1989(a), may be satisfied without a showing of actual knowledge.[9] It has not been determined, that is, whether a plaintiff must prove knowing and wilful concealment of an odometer defect by a dealer in order to recover damages under the statute, or whether it is sufficient to show that the dealer or its agents *should have known* of a defect, and then either failed to discover it or to adequately alert the purchaser.

The defendant's argument relies primarily on statutory construction. Section 408 of the MVICS Act, 15 U.S.C. § 1988, requires auto dealers to alert purchasers of odometer irregularities. It is clear from the Senate Committee report that Congress intended to impose an affirmative duty upon dealers to detect such irregularities:

> "[T]he test of 'knowingly' was incorporated [in § 408] so that the auto dealer with expertise now would have an *affirmative duty* to mark 'true mileage unknown' *if, in the exercise of reasonable care, he would have reason to know* that the mileage was more than that which the odometer had recorded or which the previous owner had certified." 1972 U.S.Code, Cong. & Adm.News, pp. 3960, 3971–72 (emphasis added).

A violation of § 408 may provide the basis for either (1) an injunction under § 410 of the MVICS Act, 15 U.S.C. § 1990, in an action brought by the Attorney General of the United States, or (2) for damages, in a private action filed under § 409 of the Act, 15 U.S.C. § 1989(a).

In the case of an action for damages under § 409, a plaintiff may not recover on the mere showing that a substantive requirement of the Act (e. g., the disclosure requirement of § 408) was violated. Rather, the relevant portion of § 409 provides that "[a]ny person who, *with intent to defraud*, violates any requirement imposed under this subchapter shall be liable [for damages]." (Emphasis added). Thus, the defendant maintains that unless actual knowledge is demonstrated the sole remedy under the Act is an injunction, which may only be issued in favor of the Attorney General of the United States in an action under § 410.

Such a construction, if adopted, would tend to nullify the effectiveness of the private treble damages remedy which Congress included in the MVICS Act. What is more important, an "actual knowledge" standard is in no way compelled by the insertion of an "intent to defraud" requirement in § 409, as a closer analysis of the statute, and a review of common law authorities, will reveal.

A requirement of actual knowledge is most appropriate in a case alleging criminal fraud.[10] Thus, in *United States v. Rowe*, 56

---

**9.** Two district courts have briefly examined the question of intent under § 409, but arrived at opposite conclusions. *See Mataya v. Behm Motors, Inc.,* 409 F.Supp. 65, 69–70 (E.D.Wis. 1976) (actual knowledge required); *Pepp v. Superior Pontiac GMC, Inc.,* 412 F.Supp. 1053, 1055 (E.D.La.1976) (negligence may satisfy "intent to defraud" requirement, especially if gross). Most of the cases dealing with "intent" under the Act have involved odometer rollbacks. Tampering had clearly taken place in these actions, and thus the principle question was whether or not the plaintiff had succeeded in showing that the tampering took place while the automobiles were in the defendant's custody. *Delay v. Hearn Ford,* 373 F.Supp. 791, 28 A.L.R.Fed. 576 (D.S.C.1974) (intent proven);

*Klein v. Pincus,* 397 F.Supp. 847 (E.D.N.Y. 1975) (same, partially on evidence of prior tampering conviction and testimony of former partners); *Birdwell v. Hartsville Motors, Inc.,* 404 F.Supp. 625 (M.D.Tenn.1975) (intent not proven). A somewhat different case is *Mayes v. Warren Hollon Motors,* 410 F.Supp. 768 (S.D. Ohio 1975). There a seller put a car on auction the mileage of which exceeded 100,000 miles; the odometer read 15,000 rather than 115,000. The court held that the plaintiff had failed to show an intent to defraud, but the result seems largely attributable to the special facts in the case.

**10.** At common law, actual knowledge was also required if punitive or exemplary damages were to be awarded. *See* 37 Am.Jur.2d *Fraud*

F.2d 747, 750 (2d Cir. 1932) (L. Hand, J.), a criminal fraud appeal, the Court upheld as sufficient a jury instruction requiring actual knowledge for conviction: [11]

> "To be told [in the jury charge] that opinions or promises are innocent unless made with a deliberate purpose to defraud left open no reasonable doubt that the defendants must have disbelieved the opinions they uttered, and not meant to perform the promises they made."

The difference here is that no criminal charge is involved. Congress did include criminal penalties under a different subchapter of the MVICS Act (see § 107(b), 15 U.S.C. § 1917(b)),[12] and in so doing plainly required that an offense be committed "knowingly and wilfully" in order to be punishable. The Senate Committee report stated, in reviewing this provision, that

> "[n]o criminal penalty shall attach to any person unless he acted with actual 'knowledge' *or knowledge fairly implied on the basis of objective circumstances.*" 1972 U.S.Code, Cong. & Adm.News, pp. 3960, 3967 (emphasis added).

Thus, even where a criminal penalty was intended under an Act, the Senate Committee chose to qualify the actual knowledge standard, allowing convictions where actual knowledge could be "fairly implied" from the circumstances.[13]

A similar result follows from a review of the intent standard employed in *civil* fraud suits at common law. Many courts, as a generalization, state that "scienter" is required for civil fraud liability. *See* 37 Am. Jur.2d, *Fraud and Deceit* § 197, at 260 (1968). In application, however, this principle is extensively qualified, leading one legal encyclopedia commentator to remark that "there are so many exceptions to the rule requiring knowledge to be shown that it may be worthy of inquiry whether it is exactly accurate to say that it is a general rule." *Id.* at 261–62.

■ A widely accepted rule of fraudulent intent, applicable here, is that civil liability may be imposed where it is proved that a defendant's statements were made recklessly or carelessly, without knowledge of their truth or falsity, or without reasonable grounds for belief in their truth, especially in a case where (1) the defendant was under a duty to have the knowledge in question, (2) a relation of trust or expert reliance existed, (3) a statement was made to induce a business arrangement, or (4) the knowledge or information in question was within the special province of the defendant. Such conditions being met, it does not matter whether or not the declarant actually believed the statement (or statements) in question to be true. *See, e. g., Cooper v. Schlesinger,* 111 U.S. 148, 4 S.Ct. 360, 28 L.Ed. 382 (1884); *Myron M. Navison Show Co. v. Lane Show Co.,* 36 F.2d 454 (1st Cir. 1929); *United States v. Cooperative Grain & Supply Co.,* 476 F.2d 47, 60 (8th Cir. 1973); *Campbell v. Business Men's Assur. Co.,* 31 F.2d 571, 573 (W.D.Mo.1928), *aff'd,* 32 F.2d 995 (8th Cir. 1929); *Barrington v. Swanson,* 249 F.2d 640, 645 (10th Cir. 1957); *McMahon v. Grimes,* 206 Cal. 526, 534–35, 275 P. 440 (1929); *Clark v. Haggard,* 141 Conn. 668, 109 A.2d 358, 54 A.L.R.2d 655 (1954); *Boss v. Tomaras,* 241 Mich. 540, 217 N.W. 783 (1928); *Abel v. Paterno,* 245 A.D. 285, 281 N.Y.S. 58 (1st Dep., 1935); *Restatement, Torts* §§ 526, 527 and 529; 37 Am. Jur.2d *Fraud and Deceit* § 203, at 269 n. 3 (additional general citations); *see also Schwinn v. United States,* 112 F.2d 74, 75

*and Deceit* § 347 (1968). In this case Congress has enacted remedial legislation, however, and so this common law principle is not controlling.

11. The defendants had argued that the instruction was not sufficiently clear in specifying that actual knowledge was necessary.

12. This provision prohibits the manufacture, sale, transport, or importation of motor vehicles that do not comply with federal bumper

standards, after the effective date of the Act. An offender convicted under § 107(b) may be subjected to a fine of $50,000, a sentence of up to one year in prison, or both.

13. *Compare Russo v. Hochschild,* 184 Md. 462, 41 A.2d 600, 157 A.L.R. 1070 (1945), where a stricter standard was applied for civil fraud liability.

(9th Cir. 1940) (declarant having "special means of knowledge"); *Walker v. Dept. of Public Works*, 108 Cal.App. 508, 291 P. 907 (1931) (relationship of trust); *but see Russo v. Hochschild Kohn & Co.*, 184 Md. 462, 41 A.2d 600, 157 A.L.R. 1070 (1945). Similarly, if an opinion is offered in the course of commercial negotiations, the opinion must be offered in good faith. *Keeler v. Fred T. Ley & Co.*, 49 F.2d 872, 874 (1st Cir. 1931); *Vulcan Metals Co., Inc. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918) (L. Hand, J.) (equality of position important factor); *McNabb v. Thomas*, 88 U.S.App.D.C. 379, 190 F.2d 608 (1951); *Seeger v. Odell*, 18 Cal.2d 409, 115 P.2d 977, 136 A.L.R. 1291 (1941) (Traynor, J.).

█ Fenton Ford made several representations to the plaintiff—in particular through the oral statements of its sales agent [14] and through the preparation of the OM Statement given to the Joneses which did not alert them to odometer defects—which in retrospect were false and misleading. In light of all the circumstances, these representations were sufficiently reckless to support liability under § 409 of the MVICS Act.

█ Accepting *arguendo* the truth of the "clerical error" testimony submitted by the defendant,[15] the absence of an OM Statement in the file relating to the 1970 Bel Air should nevertheless have operated as a "red flag" alerting Fenton Ford's personnel to the possibility of some type of odometer irregularity. Instead, the defendant contends that his dealership personnel acted innocently, because they were not put actively on notice of the precise defect, which affected the automobile while in the defendant's possession. However, precise notice is not required under the MVICS Act, which imposes an affirmative duty upon auto dealers to discover such defects.[16]

When Fenton Ford's sales agent told the Joneses that the odometer mileage on the Bel Air was accurate, "to the best of [his] knowledge," one must conclude that he spoke either with an intent to deceive or with a reckless disregard for the truth. An accurate representation on the salesman's part would have been to declare that, in light of the incomplete file on the automobile, he could not truthfully *say* whether or not the odometer reading was correct. To make a statement which assumed the affirmative was to recklessly overstate the facts as he then knew them (or could have known them). It is precisely this type of reckless overstatement that is condemned in the common law civil fraud cases, on an equal basis with statements actually known by the declarant to be false when made.

Much the same reasoning applies to the preparation of an OM Statement by the defendant's office employee who failed to alert the Joneses to the odometer's inaccuracy. The absence of an original OM Statement in the automobile's file should have led the individual charged with certifying the new OM Statement to launch an inquiry into the true facts. This employee should

---

14. *See* note 4 *supra* and accompanying text.

15. Ample grounds exist to discredit this testimony: (1) The facts suggest clearly that the defendant's employees repaired the Bel Air's odometer, and yet no records were evidently kept of the repair, and no notification patch was affixed to the car's left door frame as required under § 407 of the MVICS Act, 15 U.S.C. § 1987; (2) the "puffing" engaged in by the defendant's sales agent, who asserted that the car was "new on the lot" and was earmarked to be a weekly "special," suggests a lack of veracity; (3) the conspicuous absence of investigatory steps by Fenton Ford employees to discover the whereabouts of the missing OM Statement, or to ascertain the history of the car's odometer, when such actions would seem obviously appropriate under the postulated circumstances, raises doubts as to the truthfulness of the defense; and (4) Chris Lambert, the employee responsible for the alleged misfiling, was not put on the stand at trial.

16. Mere negligence may be insufficient to sustain an award of damages, as discussed earlier. But the Court finds that more than simple negligence was involved here. It serves no particular purpose to decide whether "gross negligence," "recklessness," or some other related term best describes the defendant's actions. Suffice it to say that the facts of this case demonstrate sufficient abrogation of statutory duty to sustain an action for damages under the MVICS Act, for reasons to be stated below.

not have prepared an OM Statement which failed to put the Joneses on notice in any way of a possible defect.

■ It is no defense to assert that defects in the design or supervision of the dealership's record-keeping system were responsible for the misrepresentation in this case, rather than employee recklessness per se. In the first place, as already established, recklessness on the part of individual Fenton Ford employees was amply proven. What is more important, however, is that the maintenance of a thorough, well-supervised record-keeping system with respect to OM Statements is a clear, implicit requirement of the MVICS Act. At the very least, it should be required that sales personnel read and accurately represent to prospective purchasers the content of an automobile's file, and that OM Statements be certified only upon the basis of back-up information actually available in the file.[17]

An automobile dealer may frequently experience high personnel turnover, as was evidently the case with Fenton Ford, but this fact merely reinforces the need for adequate control systems and surveillance by long-term employees. The evidence indicates that such supervision and controls were fundamentally lacking at the defendant's establishment. It is obvious that errors may crop up occasionally in even the best-managed of record-keeping systems. The facts in evidence here do not frame any close question in this regard, however, and

so the matter need not be explored further at this time.

On the question of liability, the Court finds that the representations made to the plaintiff-purchaser Jones, by agents and employees of Fenton Ford, Inc., in Jones' purchase from the defendant of a 1970 Chevrolet Bel Air were false and misleading, and that these representations were made with actual knowledge of their falsity, or with such reckless disregard of the truth as to satisfy the "intent to defraud" requirement in § 409 of the MVICS Act, 15 U.S.C. § 1989(a). This leaves only the question of damages to consider.

(b) *Damages*

The plaintiff claims the following items of actual damage:[18]

| | |
|---|---|
| 1. Sales tax on purchase of automobile | $ 110.70 |
| 2. Vehicle registration fee | 10.00 |
| 3. Insurance (fire, theft, collision) | 139.00 |
| 4. Transmission repairs | 300.34 |
| 5. Value of installment note | 2006.25 |
| 6. Value of trade-in ('67 Ford Falcon) | 50.00 |
| 7. Cost of rental cars | 30.49 |
| 8. Interest on bank note (to 5/2/75) | 25.62 |
| 9. Attorney's fees | 3050.00. |

■ In *Klein v. Pincus,* 397 F.Supp. 847 (E.D.N.Y.1975), the court assessed damages by subtracting from the purchase price of the automobile in question (1) the depreciation in the car's value over the year in which the plaintiff operated it,[19] and (2) the amount received by the plaintiff upon sale

17. A corporation may act only through its agents and employees. Yet a corporation may be held liable for criminal acts, if those agents or employees who have power to bind the corporation engage in the requisite criminal behavior. *United States v. Interstate Engineering Corp.,* 288 F.Supp. 402, 412 (D.N.H.1967), *aff'd. sub nom. New England Enterprises, Inc. v. United States,* 400 F.2d 58 (1st Cir. 1968), *cert. den.,* 393 U.S. 1036, 89 S.Ct. 654, 21 L.Ed.2d 581. The same reasoning, of course, applies to the imposition of civil penalties which require particular intent or behavior. In this case, adequate controls at the dealership level are essential for effective compliance with the MVICS Act. The defendant's chief executive is well aware of this Act, and so testified in Court. This being so, there can be little excuse for ineffective supervisory controls.

18. In addition to damages, the plaintiff amended his complaint after trial, with the leave of the Court, to seek "[s]uch further equitable relief as the court may deem appropriate." *See* F.R.Civ.P. 15(b). Although a prayer for equitable relief does inject some new elements into the case, the Court finds that no undue prejudice has been placed on the defendant by allowing the amendment under the existing circumstances.

19. Since Jones operated the car in question here for less than a month, if repair lay-overs are taken into consideration, depreciation is not a relevant factor in this case.

of the car to a third party. The resulting figure was trebled to arrive at the final damages figure.

■ This approach cannot be followed in the instant case, since the plaintiff introduced no evidence as to the true market value of the Bel Air automobile, taking into consideration its indeterminate mileage.[20] The omission of such evidence is not material here, however, because the Court finds that the facts of this case make it an appropriate one in which to grant a rescission of the sale.[21]

■ A traditional prerequisite of equity jurisdiction is the absence of an adequate law remedy. It is well settled, however, in the federal system at least, that equity jurisdiction is not barred unless the available legal remedy is "as complete, as practical and as efficient to the ends of justice" as that afforded by equity.[22]

Applying this standard, it is clear that the legal remedy available to the plaintiff is relatively inadequate. First, the true value of the automobile in question would be very difficult to determine in a non-arbitrary fashion, since its true mileage is indeterminate. Second, the constant malfunctions which plagued the automobile throughout the brief period in which Jones operated it strongly suggest that the vehicle is far inferior to that which he bargained for and believed he had purchased. It would needlessly burden the plaintiff to have this automobile remanded to his possession, requiring him to find some means to dispose of it. Furthermore, if a legal remedy were pursued here Jones would be required to face the defendant's counterclaim for repair and storage costs. There was no written authorization for the repairs made on the automobile after its last breakdown, and the facts strongly suggest that they were undertaken in conscious disregard of the plaintiff's expressed wishes.

The final basis for invoking equitable jurisdiction is that a clear public policy is expressed in the MVICS Act in favor of ade-

---

**20.** A rough benchmark of the car's market value may be estimated on the basis of the National Automobile Dealers Association's *Official Used Car Guide (eastern ed.)* (the "blue book"). The blue book lists $1150 as the average retail value of a 1970 Chevrolet Bel Air four-door sedan with an eight-cylinder engine, as of November, 1974, the month in which the Joneses purchased their car from Fenton Ford. The Guide states that a maximum of 40 percent of a car's value may be deducted in the case of extremely high mileage.

Using blue book values, and assuming that the Bel Air was in average condition for a car of its age, one would conclude that the overcharge to the Joneses was $1895.00 less $1150.00 = $745.00 net. Adding to this the $565.95 of allowable incidental expenses incurred by the Joneses (including sales tax, registration, insurance, and a total of $306.25 in bank interest), the total actual damages would be $1310.95. After trebling this sum, the total would be $3932.85, or $5132.85 with reasonable attorney's fees of $1200.00 (as to attorney's fees, see note 24 *infra* and accompanying text).

If the Bel Air were valuated on the basis of a forty percent high mileage deduction, the appropriate overcharge under the blue book approach would be $1895.00–$690.00 = $1205.00. Adding incidental damages and trebling would yield $5312.85, or $6512.85 after attorney's fees.

These figures are not controlling, but merely probative of the possible magnitude of an award in damages. They presuppose—among other things—the existence of reliable expert testimony conforming with the blue book analysis undertaken above. In fact, there is no indication that an expert would necessarily confine his appraisal to these figures, or even include them at all in his analysis. The foregoing may thus serve only as a rough guidepost in considering the question of damages.

**21.** Rescission being an equitable remedy based on the law of contracts, its place in a statutory action for legal damages which sounds in tort must be considered. But even the common law recognized concurrent legal and equitable jurisdiction in fraud cases, as a correlate of equity's broad prerogative to remedy fraudulent wrongs. 37 Am.Jur.2d *Fraud and Deceit* § 323 (1968). There can thus be little question that the Court may properly exercise pendent equitable jurisdiction in this case.

**22.** *Gormley v. Clark,* 134 U.S. 338, 349, 10 S.Ct. 554, 33 L.Ed. 909 (1890); *see also Terrace v. Thompson,* 263 U.S. 197, 214, 44 S.Ct. 15, 68 L.Ed. 255 (1923); *Walla Walla v. Walla Walla Water Co.,* 172 U.S. 1, 11–12, 19 S.Ct. 77, 43 L.Ed. 341 (1898); *Kilbourn v. Sunderland,* 130 U.S. 505, 514, 9 S.Ct. 594, 32 L.Ed. 1005 (1889); *United States v. Howland,* 4 Wheat. 108, 17 U.S. 108, 113, 4 L.Ed. 526 (1819) (Marshall, C. J.).

quately protecting consumers who purchase automobiles which may suffer from an odometer defect. *See* 15 U.S.C. § 1981. Where public policy considerations are thus involved, a resort to equitable remedies has been deemed to be especially appropriate.[23]

Accordingly, the defendant shall make restitution for the full value of the automobile purchased from it by the plaintiff—including the value of the installment note ($1750.00), the down-payment ($221.70), and the trade-in allowance for the plaintiff's 1967 Ford Falcon ($50.00). In addition to this sum, the defendant shall pay the plaintiff the statutory minimum penalty of $1500.00,[24] plus $1200.00 for attorney's fees.[25] In return, the defendant-dealership shall retain ownership and possession of the automobile.

Having granted rescission, the defendant's counterclaim becomes moot, since it depends implicitly upon the plaintiff's continued ownership of the automobile.

The foregoing opinion shall constitute the findings of fact and conclusions of law required to be filed by the Court, pursuant to Rule 52(a), Fed.R.Civ.P.

The parties shall submit an appropriate order within ten (10) days. SO ORDERED.

23. *See United States v. First National City Bank,* 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965).

24. Once items relating to the purchase price of the Bel Air are eliminated, along with items relating to the defendant's counterclaim, all that remains on the plaintiff's list of actual damages are three particulars: (1) cost of rental cars ($30.49); (2) interest on bank note ($25.62 at filing, $306.25 total); and (3) insurance ($139.00). The first item is not properly allowable, since these rental expenses relate primarily to breakdowns which incapacitated the plaintiff's primary vehicle, a Ford Pinto, rather than the Bel Air. Trebling the latter two items does not generate a recovery in excess of $1500.00, and so the statutory minimum penalty will be imposed.

The imposition of a statutory penalty in any form would at one time have been improper on the part of a court sitting in equity. *See Ash Sheep Co. v. United States,* 252 U.S. 159, 170, 40 S.Ct. 241, 64 L.Ed. 507 (1920); *Marshall v.*

*Vicksburg,* 15 Wall. 146, 82 U.S. 146, 149, 21 L.Ed. 121 (1872) ("Equity never, under any circumstances, lends its aid to enforce a forfeiture or penalty . . ..."). With the merger of law and equity, this principle has been expressly rejected as a controlling rule, at least with respect to penalties. *See, e. g., Commonwealth Edison Co. v. Allis-Chalmers Mfg. Co.,* 210 F.Supp. 557, 569 (N.D.Ill.1962); *United States v. Connolly,* 3 F.R.D. 417, 418–19 (D.Mont.1943).

25. The plaintiff's counsel has submitted an affidavit seeking $3050.00 in attorney's fees, which includes 46 hours of preparation at $50.00 per hour, and 6 hours of trial at $125.00 per hour. This affidavit was prepared hurriedly at the conclusion of the trial, and is not supported by time sheets or other documentary evidence. In light of all the circumstances, the Court finds that $1200.00 is a reasonable fee for counsel's services.