Stanley **KANTORCZYK**, Plaintiff,

v.

**NEW STANTON AUTO AUCTION, INC.,** a corporation, and W. J. Reynolds, Individually and doing business as Reynolds Cars, Defendants.

**W. J. REYNOLDS,** trading and doing business as Reynolds Cars, Plaintiff,

v.

**NEW STANTON AUTO AUCTION, INC.,** Defendant.

Civ. A. Nos. 76–722 and 76–1319.

United States District Court, W. D. Pennsylvania.

May 7, 1977.

---

26. But cf. *Hurley v. Van Lare,* supra.

Saul Davis, Pittsburgh, for Stanley Kantorczyk.

John W. Pollins, III, Greensburg, Pa., for W. J. Reynolds and Reynolds Cars.

Morley M. Azorsky, California, Pa., for New Stanton Auto Auction, Inc.

## OPINION

MARSH, District Judge.

In May, 1976, Stanley Kantorczyk brought suit against New Stanton Auto Auction, Inc., and against W. J. Reynolds, individually and doing business as Reynolds Cars. Nearly five months later, Reynolds brought suit against New Stanton.

Both suits were brought pursuant to the Motor Vehicle Information and Cost Savings Act, 15 U.S.C. § 1989(b), and both actions involve a 1971 Plymouth station wagon which Reynolds purchased at the New Stanton auction and which Reynolds later sold to Kantorczyk. There is no allegation or evidence that the vehicle's odometer ever malfunctioned or that it had been altered or reset. It was alleged, however, that the vehicle had been driven more than 100,000 miles and that therefore the odometer registered 100,000 miles less than the vehicle's actual mileage.

Kantorczyk seeks awards of $1,500 plus costs and attorney fees against each defendant. Reynolds claims compensatory and punitive damages against New Stanton, or in the alternative an award of $1,500, whichever is greater, plus costs and attorney fees.

The cases were consolidated for trial. The trial before the court and an advisory jury began on April 18, 1977, and lasted for three days. The jury rendered a special verdict answering five questions submitted by the court (See Appendix).

After consideration of all the evidence [1] the court makes the following findings of fact.

## FINDINGS OF FACT

1. Stanley Kantorczyk is a resident of Allegheny County, Pennsylvania. New Stanton Auto Auction, Inc., a Pennsylvania corporation with its principal place of business in Westmoreland County, Pennsylvania, is engaged in the business of conduct-

---

1. A transcript of the trial was not ordered by any of the litigants.

ing an auction as a means of bringing together automobile dealers for the sale of used cars. W. J. Reynolds is engaged in the business of buying and selling automobiles under the business name of Reynolds Cars in Westmoreland County, Pennsylvania.

2. On May 27, 1975, Reynolds sold a 1971 Plymouth station wagon to Stanley Kantorczyk for $1,495. Prior to the sale, Kantorczyk had visited Reynolds' car lot twice and Reynolds had allowed Kantorczyk to take the station wagon home for a weekend.

3. At the time of the sale, Reynolds delivered to Kantorczyk an Odometer Mileage Statement certifying *inter alia* that the odometer reading was 50,006 miles, and leaving blank the provisions on the form for "total accumulative miles (if over 100,000)" and "true mileage unknown" (Exhibit No. 1).

4. At the time of sale, Reynolds did not know that the actual mileage on the 1971 Plymouth was in excess of the 50,006 miles then shown on the odometer. Specifically, Reynolds did not know that the actual mileage on the Plymouth was 150,006 miles at the time he sold the Plymouth to Kantorczyk.

5. Reynolds had purchased the 1971 Plymouth for $585 (plus a $10 auction fee) on July 25, 1974 at an auction conducted by defendant New Stanton.

6. At the time of purchase, Reynolds found the interior of the car to be in excellent condition and the car's body to be in good condition. Reynolds believed the average price for such a car to be about $1,200, and he had been prepared to bid as high as $900 or $1,000 for the car.

7. New Stanton had received the vehicle from Gary Auto Lease, Inc., of Morristown, New Jersey, which had leased the vehicle to Pennsylvania Electric Company. The Certificate of Title shows an assignment of title for the 1971 Plymouth from Gary Auto Lease, Inc., to New Stanton (Exhibit No. 5).

8. New Stanton's practice was to collect $10 from the seller and $10 from the buyer for each transaction at the auction. Subsequent to the sale to Reynolds, New Stanton sent a check for $575 to Gary Auto Lease, Inc.

9. An odometer disclosure statement from Gary Auto Lease, Inc., was in the possession of New Stanton at the time of the auction on July 25, 1974 (See Pretrial Stipulations 9, 10; Civil Action No. 76–1319). Generally the odometer statement and title certificate arrived at New Stanton attached by a paper clip.

10. The odometer disclosure statement executed by Gary Auto Lease, Inc., on July 9, 1974, stated that the odometer reading on the 1971 Plymouth was 48,036 with true mileage of 148,036. There is no checkmark in the space which is to be checked if the odometer reading is known to differ from the actual mileage. The odometer statement is not signed by either Gary Auto Lease, Inc. or by New Stanton.[2]

11. The Odometer Disclosure Statement executed by Gary Auto Lease, Inc. was not given to Reynolds before or after the sale. The mileage as represented on that statement (148,036) was not revealed by New Stanton at the time of the auction.

12. New Stanton did deliver to Reynolds a Certificate of Mileage (Exhibit No. 2) dated July 25, 1974 and signed by Dyke Orr, president of New Stanton, certifying "I am the owner of a certain 1971 Plymouth" and stating that "the speedometer showed a total mileage of 48,186 miles."

To have travelled 148,000 miles from the time Gary purchased the new Plymouth in August, 1971 until the time Gary sold the car in July, 1974, the vehicle would have to have been driven an average of almost 1,000 miles per week.

Reynolds and New Stanton argued that such high mileage was unreasonable, but neither Reynolds nor New Stanton offered any competent evidence to support their argument.

---

**2.** Kantorczyk Exhibit No. 3 appears to be a copy of the odometer disclosure statement from Gary Auto Lease, Inc., to New Stanton. The original of Kantorczyk Exhibit No. 3 was not introduced in evidence or otherwise accounted for.

Other than this exhibit, Kantorczyk introduced no competent evidence to indicate that the vehicle had actually travelled 100,000 miles more than the mileage registered on the odometer.

13. In preparing odometer statements for New Stanton customers it was the practice in July, 1974 for New Stanton employees to use the mileage information from the auction sales slip. The mileage information on the sales slip was taken directly from the vehicle's odometer.

14. After Reynolds purchased the Plymouth at the auction, Reynolds and his employees operated the vehicle for approximately 1,800 miles before it was sold to Kantorczyk.

15. After Kantorczyk purchased the Plymouth from Reynolds, Kantorczyk drove the station wagon more than 18,000 miles in approximately 14 months. During this period, Kantorczyk spent an estimated $500 on various repairs to the vehicle. Also during this period, the station wagon was damaged in an accident, but the accident damage was never repaired.

16. On May 27, 1976, Kantorczyk filed this action against New Stanton and Reynolds alleging violations of the Motor Vehicle Information and Cost Savings Act (Civil Action No. 76–722).

17. In early August, 1976, Kantorczyk sold the Plymouth for $150 by delivering the vehicle to John Burnsworth, owner of J & E Auto Company, and by executing a blank assignment of the Certificate of Title, contrary to the instructions on the title form. Kantorczyk told Burnsworth that the actual mileage on the car was 168,000. Kantorczyk did not deliver an Odometer Disclosure Statement to Burnsworth or to Dale Provins who apparently purchased the Plymouth on August 12, 1976. The Certificate of Title lists the mileage as 70,000 at the time of the assignment from Kantorczyk to Provins.

18. On October 20, 1976, Reynolds brought his suit against New Stanton (Civil Action No. 76–1319).

19. At the trial, Lou A. Fazio, who has operated a used car auction for 18 years, testified that it is very difficult to determine a car's mileage accurately without looking at the odometer. He testified that on the basis of his experience a three-year-old vehicle could have been driven 100,000 miles more than that shown on the odometer and yet be in such condition that an expert would not be able to tell that the car had travelled the additional miles. This testimony was not contradicted.

## DISCUSSION

The legislative history of the Motor Vehicle Information and Cost Savings Act speaks primarily of odometers which have been tampered with or altered. Where a vehicle has travelled in excess of the mechanical limits of the odometer, Congress evidently intended that the seller should enter the total estimated cumulative mileage on the odometer form.[3] The statute and the applicable regulation provide that if a transferor knows the odometer reading to be different from the number of miles the vehicle has actually travelled, the transferor must disclose that the actual mileage is unknown. See 15 U.S.C. § 1988(a)(2); 49 C.F.R. § 580.4(c).

■ Plaintiff Kantorczyk produced no evidence to prove that Reynolds knew or should have known that the automobile had travelled more than 100,000 miles. In fact, our recollection of the testimony is that there was no evidence to show that on May 27, 1975 Reynolds knew any more about the actual mileage of the car than did his customer, Kantorczyk. We believe the jury was correct in concluding that Reynolds did not know that the actual mileage was in excess of 50,006 and that Reynolds did not intend to defraud Kantorczyk.

■ This court also believes that the jury was correct in finding fraudulent intent on the part of New Stanton.

New Stanton has argued that its practice was not to purchase cars but simply to auction the cars while acting as an agent for the lease company. However, in view

3. See Senate Rep.No. 413, October 28, 1971; 92nd Cong.2d sess. (1972 U.S. Code Cong. & Admin.News, pp. 3960, 3971).

of the strong documentary evidence which indicates that ownership of this particular motor vehicle was in fact transferred to New Stanton (See Certificate of Title, Exhibit No. 5), this argument must be rejected. New Stanton was a transferor within the meaning of the Act.

Had Kantorczyk convincingly proven his allegation that New Stanton had actual knowledge of the vehicle's true mileage at the time New Stanton prepared the odometer statement which was given to Reynolds, we would be faced with a situation very similar to that in *Rider Oldsmobile, Inc. v. Wright,* 415 F.Supp. 258 (M.D.Pa.1976).[4] However, the testimony of New Stanton's witnesses indicates that the procedures at the auction in July, 1974 were such that the New Stanton employee who prepared the odometer statement for Reynolds never saw the odometer statement from the previous owner, Gary Auto Lease, Inc. The New Stanton statement (Exhibit No. 2) was prepared on the basis of mileage information appearing on the auction sales slip. The sales slip was prepared using a mileage reading taken directly from the vehicle's odometer.

This practice of preparing odometer statements simply on the basis of the odometer reading and then failing to disclose that the actual mileage is unknown demonstrates a reckless disregard for the basic purpose of the Act as well as its specific requirements. In light of New Stanton's duty under that Act, we believe that such recklessness rises to the level of fraudulent intent, and the court has no choice but to impose civil liability. See *Jones v. Fenton Ford, Inc.,* 427 F.Supp. 1328, 1334 (D.Conn. 1977).

The final question is to whom is New Stanton liable. New Stanton has been sued by both Kantorczyk and Reynolds with respect to a single violation of the statute.

Reynolds argues that Kantorczyk should not be permitted to recover because, after bringing this action, Kantorczyk proceeded to violate the requirements of the very statute under which he is seeking an award. In addition to failing to provide an odometer statement to his transferee, Kantorczyk improperly signed the Certificate of Title (Exhibit No. 10) in blank. That Certificate bears the statement that the vehicle's odometer reading was 70,000 on August 12, 1976, a statement which although accurate is potentially misleading in the absence of an odometer certificate. It appears that Kantorczyk (perhaps innocently) has set in motion a series of transactions in which any future purchasers of this station wagon will be as uninformed about the car's actual mileage as was Kantorczyk.[5] We doubt that Congress ever envisioned such a result. However, we also doubt seriously that Congress drafted this act with the intention that a used car dealer could buy a vehicle at an auction, drive the vehicle as his personal car for some 1,800 miles, sell the car ten months later at a profit of $910, and then follow his customer into court claiming fraud.

To resolve this issue we turn to the basic purpose of the Motor Vehicle Information and Cost Savings Act. In one of the first cases decided under this Act, the court stated that:

> "The purpose of the statute is to punish odometer tamperers by imposing civil penalties upon them and to reward purchasers who discover such tampering and violate [15 U.S.C.] § 1988(b), which makes it unlawful 'to knowingly give (sic) a false statement to the transferee in making any disclosure required by such rules.'"
> 415 F.Supp. at 263.

4. In *Rider Oldsmobile, Inc. v. Wright,* the defendant had been the sole owner of an automobile which had been driven more than 135,000 miles although the odometer registered 35,000. The court held that since the defendant did in fact know the actual mileage, his failure to state that the mileage was unknown was not conduct covered by the plain meaning of the statute.

"Forcing him to state that the actual mileage was 'unknown', as appears to be the thrust of [49 C.F.R.] § 580.4(c), would require him to

5. This court expresses no opinion on the question of whether Kantorczyk's failure to comply with the statutory requirement would be sufficient to support a finding of civil liability in favor of some subsequent transferee.

bring it to the attention of the federal courts."

*Delay v. Hearn Ford,* 373 F.Supp. 791, 796 (D.S.C.1974).

In the instant case, there is no question that it was Kantorczyk who discovered the violation of the odometer disclosure requirements and who brought the violation to the attention of the court. Reynolds brought his action not as a private attorney general representing a public interest, but rather as a "cross-claimant" seeking some form of indemnity or contribution.[6] We believe that the $1,500 award must go to Kantorczyk.

## CONCLUSIONS OF LAW

1. New Stanton Auto Auction, Inc., was a transferor within the meaning of the Motor Vehicle Information and Cost Savings Act when it transferred ownership of the 1971 Plymouth station wagon to W. J. Reynolds.

2. New Stanton Auto Auction, Inc., acting with reckless disregard for its statutory duty, violated a requirement of the Act with fraudulent intent when it failed to disclose to transferee Reynolds that the actual mileage of the vehicle was unknown, or that the actual mileage reported by Gary Auto Lease, Inc., was 148,036.

3. Pursuant to 15 U.S.C. § 1989, New Stanton Auto Auction, Inc., is liable to plaintiff Stanley Kantorczyk in the amount of $1,500.

4. W. J. Reynolds did not knowingly give a false statement to Stanley Kantorczyk and did not violate any requirement of the Act with intent to defraud.

5. W. J. Reynolds is not liable to Stanley Kantorczyk under 15 U.S.C. § 1989.

6. New Stanton Auto Auction, Inc., is not liable to W. J. Reynolds under 15 U.S.C. § 1989.

## ATTORNEYS' FEES

■ Although Kantorczyk's role as a private attorney general was somewhat tainted by his actions subsequent to bringing this lawsuit, he is nonetheless entitled to recover his costs and a reasonable attorney's fee. Kantorczyk's counsel has submitted an affidavit stating that the costs totalled $204.30, and that the attorney spent 63.5 hours working on the case. The trial itself, including jury selection, opening and closing statements, testimony, and instructions to the jury, involved approximately 12 hours of in-court time. Pretrial conferences accounted for another two hours. Counsel seeks compensation at the rate of $50 per hour.

Counsel's petition and affidavit make no effort to distinguish between the time spent on Kantorczyk's successful claim against New Stanton and the time spent on Kantorczyk's unsuccessful claim against Reynolds. In light of the evidence presented at trial, we are not convinced that it was necessary to proceed to trial against both defendants in order to discover the source of the fraud. We do believe that some portions of counsel's pretrial preparation would have required the same number of hours regardless of how many defendants had been named in the suit. However, we are also convinced from the record before us that at least half of counsel's out-of-court time was related solely to the claim against Reynolds. The only memoranda of law prepared by Kantorczyk's counsel were a brief in opposition to Reynolds' motion to dismiss and a post-trial brief in opposition

6. In *Stier v. Park Pontiac, Inc.,* 391 F.Supp. 397, 401 (S.D.W.Va.1975), the court held that Congress did not intend that each subsequent wrongdoer might hold liable each prior wrongdoer in the chain linked to the initial violation:

"[I]t is reasonable to conclude that a subsequent violator in the chain approves and ratifies the acts of previous wrongdoers when he continues the deception instead of discovering and reporting it, and consequently in eq-

uity and justice he should not be allowed to profit from violations of others whose acts he has approved and ratified."

Although Reynolds was not a subsequent violator or wrongdoer, and although we do find that he was not aware of and did not in any way approve or ratify the acts of New Stanton, it is undisputed that Reynolds was able to sell the Plymouth at a higher price as a result of New Stanton's violation.

to Reynolds' motion for involuntary dismissal. We are aware of no briefs submitted on behalf of Kantorczyk with respect to the claim against New Stanton. Furthermore, the presence of the second defendant (Reynolds) added considerably to the length of the trial. Therefore, it is our opinion that Kantorczyk may collect a reasonable attorney's fee from New Stanton for a maximum of seven hours in trial, two hours in pretrial conferences, and 21 hours out-of-court.

The rate of $50 per hour for in-court time is reasonable for Kantorczyk's counsel. In determining the reasonable fee for out-of-court hours, however, the court cannot overlook the fact that Kantorczyk's case was an extremely simple one. In addition to Kantorczyk himself, the only witnesses called by the plaintiff were defendant Reynolds and Warren D. Orr, president of defendant New Stanton. It took approximately three hours (including time for cross-examination) to present the case against both defendants. Because Kantorczyk sought only the statutory award of $1,500 rather than actual damages, his counsel was not required to prepare any proof of damages.

The simplicity of the claim is further reflected in the fact that Kantorczyk did not meet his attorney until two days before trial (their previous contact had been several telephone conversations), and in the fact that Kantorczyk's counsel did not feel any need to brief the issues involved in the claim against New Stanton. While we believe that Kantorczyk's counsel did a competent job of representing his client, this does not affect our belief that the legal work required in this case was by no means complicated. For the out-of-court time, an hourly rate of $35 is fair and reasonable.

These rates for in-court and out-of-court time produce a lodestar figure of $1,185. As noted above, the work of Kantorczyk's counsel was competent, and, as counsel acknowledges in his petition, the chances were good that Kantorczyk would succeed against New Stanton. Accordingly, there is no need for the court to adjust the lodestar figure.

Plaintiff Kantorczyk has listed costs totalling $204.30. He is entitled to recover $191.70 in costs from defendant New Stanton (Filing fee, $15; Service of complaint, $14.70; copies of depositions, $133.50; copy of pretrial conference transcript, $28.50). Plaintiff Kantorczyk is not entitled to recover the $12.60 spent to serve a copy of the complaint on defendant Reynolds.

Counsel for Reynolds has submitted a petition for attorney's fees in the amount of $3,406.66 (85.16 hours at $40 per hour). This petition will be denied.

An appropriate order will be entered.

## APPENDIX

### SPECIAL VERDICT

1. Did New Stanton Auto Auction, Inc., their officers or employees know that the actual mileage on the 1971 Plymouth Station Wagon was 148,036 miles and therefore was in excess of the 48,186 miles shown on the odometer at the time New Stanton Auto Auction, Inc. transferred the ownership of the Plymouth Station Wagon to W. J. Reynolds, individually and trading as Reynolds Cars?

ANSWER: YES OR NO      YES

2. Did New Stanton Auto Auction, Inc. by its president Mr. Orr, with intent to defraud W. J. Reynolds, give a false statement to W. J. Reynolds with respect to the actual number of miles the 1971 Plymouth Station Wagon actually travelled?

ANSWER: YES OR NO      YES

3. Did W. J. Reynolds know that the actual mileage on the 1971 Plymouth Station Wagon was in excess of the 50,006 miles shown on the odometer at the time he transferred the ownership of the Plymouth to the plaintiff, Stanley Kantorczyk?

ANSWER: YES OR NO      NO

4. Did W. J. Reynolds know that the actual mileage on the 1971 Plymouth Station Wagon was 150,006, miles and therefore was in excess of 50,006 miles shown on the odometer at the time W. J. Reynolds,

individually and trading as Reynolds Cars transferred the ownership of the Plymouth to the plaintiff Stanley Kantorczyk?

ANSWER: YES OR NO     NO

5. Did W. J. Reynolds, with intent to defraud Stanley Kantorczyk, give a false statement to Stanley Kantorczyk with respect to the actual number of miles the 1971 Plymouth Station Wagon actually travelled?

ANSWER: YES OR NO     NO