JANICE CIAMPI, Plaintiff-Appellee, v. OGDEN CHRYSLER PLYMOUTH, INC., Defendant-Appellant.

Second District    No. 2—93—0014

Opinion filed May 19, 1994.

J. Michael Fitzsimmons and Lisa A. Johnson, both of Fitzsimmons, Roberts & Paine, of Oakbrook Terrace (Matthew T. Caruso, of counsel), for appellant.

Norman H. Lehrer, of Lehrer, Flaherty & Canavan, of Wheaton (Maureen H. Flaherty, of counsel), for appellee.

JUSTICE COLWELL delivered the opinion of the court:

Plaintiff, Janice Ciampi, initiated a complaint against Ogden Chrysler Plymouth (Ogden) and Chrysler Motors Corporation (Chrysler) alleging common-law fraud and fraud under the Illinois Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 1992)), and against Peerless Federal Savings and Loan (Peerless) for revocation of a retail installment contract in connection with Ciampi's purchase of a Chrysler LeBaron from Ogden that was financed by Peerless. Ciampi amended her complaint by alleging an additional violation of the Federal odometer statute (15 U.S.C. § 1981 *et seq.* (1982)) against Ogden. The trial court granted summary judgment to Chrysler and Ciampi settled with Peerless prior to trial, leaving Ogden as the only remaining defendant. A jury returned a verdict in favor of Ciampi on the common-law fraud count and awarded $5,000 in compensatory damages and $100,000 in punitive damages. The jury also found in favor of Ciampi on the Federal odometer violation and assessed $1,500 in damages. The Consumer Fraud Act claim was not tried to the jury, and the trial court took it under advisement and thereafter entered judgment in favor of Ciampi. The trial court awarded $35,070

in attorney fees to Ciampi under the Consumer Fraud Act claim. In its judgment, this award of attorney fees was offset against the punitive damages awarded on the common-law fraud count. The trial court denied Ogden's motion for a judgment notwithstanding the verdict, and this appeal followed.

Ogden claims on appeal that: (1) Ciampi presented insufficient evidence of fraud or other violations; (2) the trial court erred in instructing the jury; (3) the trial court erred in admitting plaintiff's exhibit No. 2, the window sticker; (4) the compensatory damages were unjustified; (5) the punitive damages were improper and excessive; and (6) the award of attorney fees was improper. We affirm.

The jury trial began on April 13, 1992. Ciampi testified that she was looking for a new car in September 1988. At that time she owned a 1985 Honda Civic outright. She had purchased new cars before but always with the assistance of her husband or her father. On or about September 17, 1988, Ciampi drove by Ogden and decided to stop and look at cars. She was approached by a salesman named Todd Lee. She told Lee that she was interested in the new LeBarons but she thought they were out of her price range. Lee told her that Ogden had executive driven cars and "demos" that were more in her price range. Ciampi said she did not want an executive driven car because they were on the used car lot and she wanted a new car warranty. Lee then showed her three demos at the back of the new car lot. Lee said these cars included a new car warranty. Ciampi took one of these cars for a test drive. She asked Lee why the car did not have a window sticker. Ciampi testified that Lee had the sticker in his hand and proceeded to read to her the options on the car. She described the window sticker as the paper which lists the options and other information about the car and the manufacturer's suggested retail price.

Ciampi glanced at the odometer during the test drive and noticed that it read over 13,000 miles. She told Lee she thought this was a lot of miles for a demo. Lee said the salesman who drove the car lived in Chicago and that they were highway miles. Lee then asked Ciampi what he could do to sell her the car today. Ciampi replied that she was not buying a car today but they could talk about price. Lee indicated he wanted to have her Honda appraised before they talked price. Lee then told her he could not go to the sales manager with any offer unless he had a check or cash deposit from her. After Ciampi refused to give Lee a check or cash deposit, Lee told her she was never going to find out how much the LeBaron cost if she did not let the sales manager know she was serious. Ciampi thought it was all right at that point to see what kind of price she could get, so she gave Lee her Visa card.

Lee left and came back with another man whom he introduced as the assistant sales manager. This man asked Ciampi what she could afford a month. Ciampi said $200. The assistant sales manager wrote it down, said he would show it to the sales manager, and left the room with Lee. Both men returned with a counteroffer from the sales manager of $280 or $289. Ciampi told the men she did not like buying a car like this because she did not know what the total price of the car was. She was then told she had to make a counteroffer, so she said $210. Ciampi said she still had not seen the window sticker although she had asked about it.

Ciampi said they counteroffered back and forth several times until the assistant sales manager came back with an agreement on $225. The men then congratulated her on buying a car. Ciampi told them she was not buying a car today and that she still wanted to know the total price of the car. She also wanted to know about the new college graduate rebate and the financing charges. Ciampi said Lee and the assistant sales manager told her that the finance manager would have that information. She was then left alone in the office for 45 minutes. Ciampi went looking for Lee to get her car keys and her Visa back but was unable to find him.

Soon after, Lee reappeared and took Ciampi to see the finance manager. Ciampi told the finance manager she was not buying the car and she wanted her keys and her Visa back. The finance manager then pushed some papers toward her. Ciampi said she wanted to check the teacher's credit union because she thought she could beat the 12% financing drawn up in the papers. The finance manager put the papers into a computer and then drew up new documents with a lower interest rate. The payments were to be $229 per month for five years. When Ciampi pointed out that this amount was over the agreed payment of $225, the finance manager said "what's four bucks." Ciampi then started signing papers. She said she had been there almost four hours and "[i]t seemed to me it was easier to buy the car than just deal with it any more."

At this point, Ciampi still had not seen the window sticker from the LeBaron. She signed the papers in reliance on the salespersons' statements that she would receive a new car warranty on the vehicle. The basic warranty on this particular vehicle was supposed to be 12 months or 12,000 miles. She testified that she was given a credit of $3,800 for her Honda. Ciampi could not sign over title to her Honda because she did not have the document with her.

Ciampi said the purchase order, the finance contract, and the tax form described the LeBaron as "new." She was shown a prepared odometer certificate on the LeBaron with the number "12" typed in

for the miles on the car. Ciampi testified that the odometer certificate contained a signature of certification when it was given to her. Ciampi pointed out to the finance manager that the number was incorrect. The finance manager told her that "they all come up with 12 miles on it." Ciampi asked the finance manager if she could correct it. She wrote in 13,675 for the mileage, they both initialed it, and Ciampi signed the statement.

Ciampi returned to Lee's office where he gave her a check sheet to sign and a warranty booklet. The warranty booklet had her name on the back and listed the warranty start date as "12/31/87." The mileage at delivery space was left blank. Ciampi did not look at the warranty booklet until she went home. She then picked up her jacket in Lee's office and saw the window sticker from the LeBaron. She picked it up without reading it and put it in her purse.

Ciampi said she did not multiply $229 per month for 60 months until she went home. Later at home, Ciampi matched the figures on her car documents with the window sticker and determined she had been overcharged. She called an attorney friend, Ray Stauber, who agreed to accompany her to the dealership on Monday. On September 19, Ciampi and Stauber met with Lee and later met with the manager. Stauber told the manager that the contract bordered on consumer fraud. The manager replied that they would have to talk to his lawyer. Stauber requested that the Honda not be sold or traded. Ciampi later authorized Stauber to send a letter to Ogden; however, she never received a reply. A second letter sent to Ogden in October 1988 also received no response. Ogden called Ciampi in mid-October 1988 for the title to the Honda. Ciampi refused to send the title because she wanted her car back.

Ciampi kept the LeBaron and continued to drive it. She took the car in for service on October 10, 1988, to correct problems that Ogden had agreed to fix at the time of purchase. After this service date, she never spoke to anyone at Ogden. Ciampi admitted that no one at Ogden ever told her she did not have a warranty on the car for 12 months or 12,000 miles from the date she put her car in service. Ciampi had the car in her possession for about two years. During this period, she never made any payments pursuant to the terms of the contract.

The buyer's order on the purchase of the LeBaron showed the price of the LeBaron as $14,100 plus destination charge, delivery fee, and taxes for a total of $15,397.66. Ciampi was given a trade-in credit of $3,800 for her Honda and a Chrysler rebate of $1,000 for an unpaid cash balance due of $10,597.66. Ciampi was shown defendant's exhibit No. 1, the sheet on which Lee wrote her estimated possible

payments of $200 per month and with which she had bartered back and forth with the sales manager. The writing on the back of the sheet states "225 a month That's it or I'll go shopping! O.K. Jan." Ciampi testified that the only word she had written was "Jan" and that some of the words on the exhibit were not there when she signed it.

Ciampi testified that she recognized plaintiff's exhibit No. 2, the window sticker, as the same one Lee had in his hands during the test drive because of the way it was folded. She said the vehicle identification number matched that of the LeBaron. Ciampi was not sure if the window sticker she picked up off of Lee's desk was an original or a copy. The word "copy" in blue ink was not on the document when she picked it up.

Judith Spellman testified that she works at Bill Kay Chrysler as general manager and worked at Ogden prior to 1987. She was not working for Ogden in September 1988. Spellman was shown plaintiff's exhibit No. 2, the copy of the window sticker. Spellman stated that it was Ogden's policy not to remove window stickers until a vehicle was delivered to the purchaser, although this was not a written policy. She testified that the manufacturer's suggested retail price on plaintiff's exhibit No. 2 was $13,637 if the LeBaron was new. Ciampi's buyer's order lists the total amount of charges on the LeBaron as $15,397.66. Spellman could not state whether Ciampi was charged more than the manufacturer's suggested retail price since she did not know how much the Honda trade-in vehicle was worth. Spellman stated that when she worked at Ogden, there was no upper limit as to how many miles a car could have on it and still be sold as a new car.

Ray Stauber, an attorney and personal friend of Ciampi's, testified that he accompanied her to Ogden a couple of days after she purchased the LeBaron. Stauber believed that Ciampi had been grossly overcharged for the vehicle. Stauber and Ciampi met with the sales manager. Stauber said Ciampi had never been told the final price of the vehicle and that if an "adjustment" could not be made, she wanted her car back. Stauber suggested an adjustment of $2,500 in the price of the car, which Ogden rejected.

Carl Wascher, a former consumer loan officer, was called as an expert witness by Ciampi. Wascher defined a new car as one that had not been titled and had an odometer reading of around 30 miles or less. He opined that a car with over 13,000 miles on it would be a used car. Wascher examined the window sticker for the LeBaron, the retail order, the bill of sale, the purchase order, and the odometer mileage statement and opined that Ciampi had been overcharged by approximately $3,600. He believed the LeBaron had a retail value of

$11,700, based on information in the "Red Book," a guide used to determine the value of cars. Wascher admitted he had never personally observed the vehicle.

Frederick Weissberg, president of Schaumburg Auto Sales, was also called by Ciampi as an expert witness. Weissberg reviewed the exhibits in this case and determined that the LeBaron was a used car based on the mileage and the fact that the car was no longer covered by the warranty. He also noted that Ciampi appeared to have been charged $425 twice for the destination charge. In his opinion, Ogden overcharged Ciampi $3,000 to $4,000 for the LeBaron. He believed the retail value of the vehicle to have been no more than $10,500 on September 17, 1988.

William Koloseike, owner of Ogden, testified that Ogden had an oral policy not to remove the window sticker from a vehicle until it is delivered to the purchaser. He stated that the stickers are sometimes removed from demos if they hinder the drivers' vision.

Koloseike said that people are willing to pay more than the manufacturer's suggested retail price for an automobile on some models. He said that the LeBaron purchased by Ciampi was a demo and is thus considered new. He said that the Illinois Secretary of State defines a car as "new" until that period of time when the vehicle is sold and titled in a person's name. Koloseike explained that this definition does not consider mileage in distinguishing between new and used.

Richard Ruscitti testified that he was the sales manager at Ogden and was involved with Ciampi's purchase of the LeBaron. He said that Ciampi never asked about the total manufacturer's suggested retail price of the car. Ciampi testified on rebuttal that she had never met Ruscitti or spoken to him.

Mark Koloseike testified that he was general manager of Ogden from 1987 to 1988. His policy during this period was to have a window sticker in every new vehicle. He said his experience in the automobile industry was that a car was still considered new if it was still on the manufacturer's certificate of origin and had never been sold and titled to a customer.

Koloseike recalled that Ciampi and Stauber came into his office in September 1988 to discuss the sale of the LeBaron and attempt to renegotiate the price. Koloseike told Ciampi that she would get the full warranty on her car. When Stauber stated that he wished to lower the price of the vehicle, Koloseike said his policy was never to renegotiate the price of a car after the sale.

With the aid of notes he prepared a few days before the trial, Koloseike demonstrated during his testimony how Ogden came up with

the selling price on the car. Koloseike said the selling price of the vehicle was $14,100, although he admitted that the finance application form lists the total cash price of the car as approximately $15,390. Ogden then subtracted $3,800 for the trade-in on Ciampi's Honda for a total of $10,300. He told Ciampi this was the amount she was paying for the car, plus her trade-in. Koloseike explained to Ciampi that Ogden had originally appraised the Honda at $1,800, which added to the destination charge of $425, meant the dealership actually received $12,525 for the car. He admitted that the trade-in value for the Honda was listed on the buyer's order as $3,800 rather than $1,800. Koloseike said the $3,800 is the trade-in allowance and the $1,800 is the actual appraised value of the Honda. He said the $2,000 difference was used to discount the car to show an offer allowance where, as here, there was no cash down payment. Ogden used the higher trade-in value to secure financing.

Koloseike showed Ciampi that Ogden gave her credit for a $1,000 rebate from the $12,525 because she had no cash to put into the deal; thus, she was really paying $11,525. He then subtracted $400 for Ciampi's college graduate rebate, leaving a total of $11,125 that she was paying for the vehicle. Koloseike said the car cost the dealership $12,600, which was $1,499 more than Ciampi was paying, but they were able to sell it at that price because the car had been depreciated. However, Koloseike later testified that Ogden received $11,597 in cash for the LeBaron, in addition to Ciampi's trade-in vehicle.

Koloseike said that Ogden performed warranty work on Ciampi's LeBaron at no cost after she purchased the vehicle. Ciampi was provided with a loaner for 10 days while those repairs were being made. He examined the odometer certificate and noted that the number "12" was printed by the computer as the number of miles on the vehicle. Koloseike affirmed that Ciampi had crossed out the "12" and hand-written 13,675 onto the certificate. Koloseike said the computer was not preprogrammed to print a certain number and he does not know how the number 12 was determined to be the mileage on the LeBaron at the time the odometer certificate was prepared.

Ogden first contends on appeal that Ciampi did not set forth evidence of the occurrence of any fraud elements at trial and that the trial court abused its discretion by failing to enter a judgment *n.o.v.* on the common-law fraud count. A judgment *n.o.v.* is properly entered in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510.) In ruling on a motion for a judgment *n.o.v.*, a court does not

weigh the evidence; rather, it may only consider the evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion. (*Maple v. Gustafson* (1992), 151 Ill. 2d 445, 453.) "The court has no right to enter a judgment *n.o.v.* if there is any evidence, together with reasonable inferences to be drawn therefrom, demonstrating a substantial factual dispute, or where the assessment of credibility of the witnesses or the determination regarding conflicting evidence is decisive to the outcome." *Maple*, 151 Ill. 2d at 454.

■ Defendant contends that the evidence demonstrated that Ciampi was told the truth in connection with the purchase of the LeBaron and only suffered from buyer's remorse after the fact. The elements of a cause of action for common-law fraud are: (1) a false statement of a material fact; (2) known or believed to be false by the party making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party as a result of the reliance. Reliance by the other party must be justified. (*Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286.) Whether or not a party has adequately proved the elements of fraud is a question of fact, and the reviewing court will not disturb a trial court's finding of fraud unless it is against the manifest weight of the evidence. *Black v. Iovino* (1991), 219 Ill. App. 3d 378, 389.

■ We conclude that Ogden made false statements regarding Ciampi's purchase of the LeBaron. First, Ogden made misrepresentations as to the sale price of the vehicle. The price represented by Ogden on the buyer's order form was $14,100 plus destination charges and dealer preparation charges, taxes, and fees for a total of $15,390. Mark Koloseike admitted that the cash price of the car was listed by the finance manager on the credit application as around $15,390. However, the window sticker containing the same vehicle identification number as the LeBaron here indicates that the manufacturer's suggested retail price for this car as new with no miles was $13,637. Ogden argues that Ciampi knew or should have been aware of the price she was paying since it was clearly listed on the buyer's order. Yet the evidence indicates that she repeatedly asked for but was never shown the window sticker and was never informed of the manufacturer's suggested retail price until she got home and looked at the window sticker. The jury could conclude that Ogden intended to keep the window sticker from Ciampi so that she would not learn the true price of the car.

We also conclude that Ciampi was misled as to whether she was getting a car with a new car warranty. Ciampi testified that she was

led to believe that both new cars and demos include new car warranties, the only difference being that a demo had been driven.

The evidence at trial revealed that the basic warranty on the 1988 LeBaron was 12 months or 12,000 miles, whichever came first. The warranty book given to Ciampi when she purchased the car listed the warranty start date as December 31, 1987. The warranty book states that the basic warranty begins on the vehicle's warranty start date which "is the earlier of (1) the date you take delivery of your new car or truck, OR (2) the date the vehicle was first put into service (for example, as a dealer 'Demo' or as a Chrysler company car)."

Here, the LeBaron had over 13,000 miles on it since being put into service as a demo. Therefore, the warranty had expired by definition. Ogden argues that Ciampi was told she would receive the full warranty. Ogden notes that, in October 1988, it performed warranty work on the LeBaron after Ciampi purchased it. Ciampi was not charged for these repairs. However, the evidence indicates that the repairs made were agreed upon as part of the original deal when Ciampi purchased the car. Therefore, the jury could conclude that the overwhelming evidence indicates that Ogden misrepresented the fact that Ciampi would receive a full new car warranty.

We also believe that Ogden misrepresented the car as "new" to Ciampi in order to justify a higher price for the vehicle. William and Mark Koloseike, as well as Spellman, all testified that a demo is a new car. William Koloseike specifically stated that Ciampi was sold a "new car, new car demo. New." The retail installment contract, the buyer's order, tax form, and the vehicle identification card, all prepared by Ogden for Ciampi's purchase, designate the LeBaron as a new car.

Ogden claims that the LeBaron had never been previously titled and is designated by the Illinois Vehicle Code (Code) as "new" until it has been placed in a *bona fide* consumer use. (See 625 ILCS 5/1—216 (West 1992).) However, this Code definition was not tendered as a jury instruction and was only testified to generally by William Koloseike. Moreover, in *Maxcy v. Frontier Ford, Inc.* (1975), 29 Ill. App. 3d 867, this court stated:

> "We disagree with defendant's contention that a car is 'new,' no matter its use, wear and mileage, so long as it still carries a manufacturer's certificate of origin. It may be true, as defendant argues, that when the car still bears the manufacturer's certificate of origin and, on their records, has never been individually titled, the State does not recognize any prior purchaser. This lawsuit, however, is between the seller and the buyer, and involves

what a purchaser can reasonably understand a contractual representation of 'newness' to mean. The fact that a car is carried as new on the records of the Secretary of State and is considered as a new car by the trade practices of automobile dealers does not decide the issue. When a car is sold as 'new,' the purchaser is entitled to receive a car which does not show age and wear from whatever cause to a greater degree than reasonably may be expected in a car of the kind and price involved." *Maxcy*, 29 Ill. App. 3d at 870-71.

Whether a car is "new" is an issue to be decided by the trier of fact under the circumstances of each case and not by a mechanical application of the motor vehicle laws. (*Maxcy*, 29 Ill. App. 3d at 871.) We acknowledge that the facts in *Maxcy* are distinguishable since that case concerned a vehicle that was previously sold, recovered, and then sold by a dealership to plaintiff as a new car. Nonetheless, we believe the *Maxcy* analysis as to the definition of "new" is applicable to the case at hand. Ciampi was entitled to receive a car with an amount of wear and tear that would be reasonable for the price involved. Instead, she was charged more for a LeBaron with over 13,000 miles than the sticker price for the same car with no mileage. The jury could conclude that the LeBaron was not a "new" vehicle and that Ciampi was grossly overcharged.

Ogden argues that we must reverse the judgment on the common-law fraud claim since jury instructions Nos. 10A and 14A erroneously omitted the crucial fraud element of the justifiability of Ciampi's reliance. As previously noted, a plaintiff must show justifiable reliance on a false statement in order to establish fraud. (See *Soules*, 79 Ill. 2d at 286.) The standard for assessing the adequacy of jury instructions is whether they fully, fairly, and comprehensively inform the jury of the applicable legal principles. *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.* (1990), 196 Ill. App. 3d 5, 18.

In *Marino v. United Bank of Illinois, N.A.* (1985), 137 Ill. App. 3d 523, a case involving fraudulent misrepresentation, this court stated:

"In determining whether there was justified reliance, it is necessary to consider all of the facts in plaintiff's actual knowledge as well as those which he could have discovered by the exercise of ordinary prudence. [Citation.] While a person may rely on a statement without investigation if the party making the statement creates a false sense of security or blocks further inquiry [citation], it must be determined whether the facts were such as to put a reasonable man on inquiry." (137 Ill. App. 3d at 527.)

Clearly, the jury should have been asked to determine the justifiability of Ciampi's reliance.

■ Instructions Nos. 10A and 14A failed specifically to inform the jury that Ciampi's reliance on the fraudulent statements must be justified. However, we believe that Ogden waived this issue by failing to object specifically to instructions Nos. 10A and 14A. (See, *e.g.*, *Frankenthal v. Grand Trunk Western R.R. Co.* (1983), 120 Ill. App. 3d 409, 414.) Objections to instructions must be made with sufficient particularity to afford the court identity of the error relied upon. (*Mathis v. Burlington Northern, Inc.* (1978), 67 Ill. App. 3d 1009, 1011.) The failure specifically to set forth the error with sufficient clarity to identify the issue constitutes a waiver of objections to the instruction. (*Mathis*, 67 Ill. App. 3d at 1012.) The transcript from the jury instruction conference indicates that Ogden's objections to both instructions on the record were insufficient to preserve this matter on appeal. We note that Ogden submitted an instruction which stated that Ciampi had the burden of proving, among other things, "[t]hat the plaintiff relied on the representation and was justified in doing so." However, this instruction was withdrawn and was not ruled upon by the trial judge. We hold that Ogden waived its argument as to this issue.

Ogden also claims that the jury was improperly instructed on the definition of "new" and that counsel for Ciampi misled the jury by discrediting evidence of the Code definition of "new" when he was aware that such evidence was true and accurate.

The jury instructions as to the definition of "new" read:

Instruction No. 29: "When a car is sold as 'new', the purchaser is entitled to receive a car which does not show age and wear from whatever cause to a greater degree than reasonably may be expected in a car of the kind and the price involved."

Instruction No. 30: "Whether the automobile in question was 'new' when sold to Janice Ciampi is for you to decide."

Ogden contends that it was not for the jury to decide whether the car purchased by Ciampi was "new," but rather it was for the jury to decide whether Ogden had committed the elements of fraud. Ogden cites *Buechin v. Ogden Chrysler-Plymouth, Inc.* (1987), 159 Ill. App. 3d 237, where this court commented: "[i]n our analysis of whether fraud had been committed, we do not focus on the number of miles on the car, but on whether Buechin got a 'new' car as she and the general public understand the ordinary meaning of that word, that is, a car which has not been previously owned." (*Buechin*, 159 Ill. App. 3d at 248.) Such an analysis was germane to *Buechin* because the plaintiff there had bought a car that had been previously owned but was sold to the plaintiff as new. Thus, we held in *Buechin* that the car was not new on that basis.

■ Here, Ogden represented to Ciampi that she was buying what amounted to a "new" car with all the new car amenities, including a full warranty. As stated previously, the court held in *Maxcy* that a new car purchaser "is entitled to receive a car which does not show age and wear from whatever cause to a greater degree than reasonably may be expected in a car of the kind and price involved." (*Maxcy*, 29 Ill. App. 3d at 871.) We conclude that the definition in instruction No. 29 is in accord with the reasoning in *Maxcy*, which is cited with approval in *Buechin*. We also conclude that instruction No. 30 was proper since this court has previously held that the trier of fact is to decide whether a car is new. See *Maxcy*, 29 Ill. App. 3d at 871.

Ogden next contends that the trial court erred in allowing Ciampi's exhibit No. 2, the LeBaron window sticker, into evidence. Ogden objected to the introduction of this document at the beginning of trial on the basis that Ciampi had not previously disclosed the document pursuant to discovery requests. The first time Ogden's counsel allegedly saw the document was at the deposition of Ciampi's expert witness one week prior to trial.

Ciampi's counsel admitted he had not disclosed plaintiff's exhibit No. 2 along with the rest of the discovery documents but said he had previously made this document available along with all his other documents at Ciampi's deposition. A hearing was held to determine whether the window sticker had been disclosed to Ogden. Ogden called its former attorney, Lynn Schiek, who had taken Ciampi's deposition. Schiek testified that she did not see any documents produced or made available by Ciampi's counsel, specifically plaintiff's exhibit No. 2, during the deposition. Schiek recalled a discussion during the deposition about the location of the documents to be reviewed. Timothy Hoffman, Chrysler's attorney who was also present at Ciampi's deposition, testified that he had not seen a copy of the window sticker.

Ciampi testified that she recalled that all the documents were put on the table at her deposition and the attorneys were given an opportunity to look through them. Ciampi's counsel, Norman Lehrer, testified on his own behalf that he took out all the documents that he had for this case and put them on the table at the deposition, which was his usual practice. He recalled specifically that the window sticker was there because he noted that no questions were asked about it and that the defense attorneys picked up the window sticker and had a whispered conversation about the document before setting it down.

The trial court found that Ogden had not been surprised by the window sticker and that the document had been presented a week

previously. The trial court permitted the document at trial, noting that the document originated at Ogden's place of business and thus Ogden would have had other ways to obtain it.

■ Whether omissions in discovery are intentional or inadvertent, a reviewing court will neither condone nor tolerate false, incomplete, or inaccurate discovery. (*Boettcher v. Fournie Farms, Inc.* (1993), 243 Ill. App. 3d 940, 948.) The determination as to whether discovery has been properly answered is within the discretion of the trial court, and absent an abuse of discretion, we will not overturn the trial court's decision. (See *Webb v. Angell* (1987), 155 Ill. App. 3d 848, 860.) We believe the trial court did not abuse its discretion in allowing the window sticker into evidence.

Ogden argues that, even if the window sticker had been properly disclosed in discovery, Ciampi did not lay a proper foundation for it at trial. Ciampi testified that she was never shown the window sticker by anyone at Ogden. She picked it up when she saw it on Lee's desk and put it in her purse without reading it. She recognized it as the window sticker Lee had in his hand because of the way it was folded. Ciampi noted that the vehicle identification number was the same as the LeBaron she purchased. In addition, both William and Mark Koloseike testified that plaintiff's exhibit No. 2 appeared to be the window sticker which refers to Ciampi's LeBaron. We hold that Ciampi laid a proper foundation for the admission of the window sticker.

Ogden also contends that, even if the foundation was properly laid, the window sticker was not relevant to any issue at trial. Evidence should be admitted only if it is material, and relevancy or materiality is established if it tends to prove a fact in controversy or make a contested matter more or less probable. (*Kniceley v. Migala* (1992), 237 Ill. App. 3d 72, 81.) We conclude the window sticker here was clearly relevant to support Ciampi's contention that Ogden withheld the sticker from her in order to charge her more than the manufacturer's suggested retail price for the LeBaron. The window sticker indicates the list price for a new LeBaron without miles was much less than what she agreed to pay for the car. The sticker was not on the car and was not given to Ciampi upon her request. This document is evidence of fraud committed by Ogden and was properly admitted.

Ogden next contends that the evidence overwhelmingly showed that Ciampi received an accurate odometer statement in connection with the purchase of her car. Ciampi added this count in her amended complaint, pursuant to the Federal odometer statute (15 U.S.C. § 1981 *et seq.* (1982)). Ciampi argued, and the jury agreed, that when Ogden

gave her a signed odometer certificate that certified the mileage as "12," it knew or should have known that the certificate was inaccurate. The Federal odometer statute provides for treble damages and mandatory attorney's fees to the prevailing consumer.

Ogden contends that the evidence was overwhelming that it did not intend to defraud Ciampi in connection with the odometer certificate. Ciampi testified that as she was looking over the documents on the LeBaron, she was shown a signed, completed odometer certificate with "12" printed as the mileage on the car. Ciampi asked the finance manager if she could correct the number of miles. He agreed and she changed the mileage to read 13,675. Both Ciampi and the finance manager initialed the document. Ogden contends that Ciampi was thus given a correct statement of the mileage in connection with the transfer of ownership of the LeBaron and in compliance with the statute.

Ciampi counters that Ogden acted carelessly and with reckless disregard of the truth or falsity of the odometer statement and that such actions constituted an intent to defraud under the Federal odometer statute. (*Buechin*, 159 Ill. App. 3d at 253.) In *Buechin*, plaintiff alleged that Ogden violated section 3—112.1 of the Illinois Vehicle Code regarding odometer certification. (625 ILCS 5/3—112.1 (West 1992).) Plaintiff there test drove a car which she had been told was new and which she ultimately purchased from Ogden. She did not observe the odometer while she was driving. She testified that the worksheet describing the car had a space providing for mileage which was left blank. When plaintiff was filling out other forms pursuant to her purchase of the car, she questioned the accuracy of the odometer certificate form, which indicated the car had 10 miles on it. The salesman told her the car had 10 miles on it "give or take a few" and encouraged her to sign the odometer certificate. While driving home in the car, plaintiff noticed the odometer registered 650 miles. She returned to the dealership the next day to talk about the mileage. The salesman offered to extend the warranty by 700 miles. He then filled in the worksheet with the correct mileage. Plaintiff secured financing and tendered a check for payment on the car. A few days later, plaintiff returned to Ogden and expressed concern that a car with that many miles on it was not new. Plaintiff eventually learned that the car had in fact been sold to a previous customer. *Buechin*, 159 Ill. App. 3d at 242-43.

The court in *Buechin* cited to *Jones v. Fenton Ford, Inc.* (D. Conn. 1977), 427 F. Supp. 1328, which held that civil liability may be imposed where it is proved that "a defendant's statements were made recklessly or carelessly, without knowledge of their truth or falsity,

or without reasonable grounds for belief in their truth, especially in a case where *** the defendant was under a duty to have the knowledge in question." (*Jones*, 427 F. Supp. at 1334.) Accordingly, the *Buechin* court concluded that when the agent for defendant Ogden certified the computer-generated odometer certificate, he acted carelessly by not verifying the accuracy of that statement. Ogden had a statutory duty to ascertain the true odometer reading and to so state on the certificate. (*Buechin*, 159 Ill. App. 3d at 252.) Thus, "an intent to defraud on the part of the transferor may be inferred from a showing of gross negligence or of a reckless disregard of facts indicating the vehicle's odometer statement is inconsistent with the true odometer reading." *Buechin*, 159 Ill. App. 3d at 253.

In the instant case, the fact that Ciampi knew the mileage and even corrected the statement prior to her purchase does not counteract the fact that Ogden tendered for her signature a certified document with an erroneous statement of the mileage. Ogden acted carelessly and in reckless disregard of the truth or falsity of the statement and in violation of its duty to ascertain the correct reading. The court properly denied Ogden's motion for judgment *n.o.v.* on this issue.

Ogden next contends that the trial court's finding of liability under the Consumer Fraud Act was against the manifest weight of the evidence. Ciampi's allegations under the Consumer Fraud Act included those claims under common-law fraud and the Federal odometer laws as well as claims that Ogden "otherwise acted towards plaintiff in an unfair or deceptive manner." The trial court entered judgment for Ciampi under the Consumer Fraud Act one week after it entered judgment on the jury verdicts.

Section 2 of the Consumer Fraud Act states in pertinent part:

> "Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act' *** in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." (815 ILCS 505/2 (West 1992).)

For the same reasons that we found clear and convincing evidence of fraud and odometer violations by Ogden, we affirm the judgment under the Consumer Fraud Act.

Many of the elements of common-law fraud have been eliminated by the Consumer Fraud Act; therefore, this statute affords broader consumer protection than the common-law action of fraud by prohibiting any deception or false promise. (*Duran v. Leslie Oldsmobile, Inc.* (1992), 229 Ill. App. 3d 1032, 1039.) The elements necessary for a claim under the Consumer Fraud Act are: (1) a statement by the seller; (2) of an existing or future material fact; (3) that was untrue, without regard to defendant's knowledge or lack thereof of such untruth; (4) made for the purpose of inducing reliance; (5) on which the victim relies; and (6) which resulted in damages to the victim. (*Roche v. Fireside Chrysler-Plymouth, Mazda, Inc.* (1992), 235 Ill. App. 3d 70, 84-85.) The Consumer Fraud Act eliminated the requirement of *scienter*; thus, even innocent misrepresentations are actionable as statutory fraud. (*Duran*, 229 Ill. App. 3d at 1039.) The standard of proof required on such claims is lenient, and a single transaction is sufficient to establish a Consumer Fraud Act claim. *Roche*, 235 Ill. App. 3d at 85.

■ Section 2 of the Consumer Fraud Act states that it is an unfair or deceptive act if a seller engaged in a trade or in commerce does not advise the potential buyer of a material fact and intends that the potential buyer rely upon the omission. (815 ILCS 505/2 (West 1992); *Totz v. Continental Du Page Acura* (1992), 236 Ill. App. 3d 891, 902.) Therefore, Ogden is only liable for the failure to disclose a material fact if it intended that Ciampi rely on the omission. Circumstantial evidence may be used to establish Ogden's intent in this regard. (*Totz,* 236 Ill. App. 3d at 903.) Here, Ciampi agreed to purchase the LeBaron in reliance on Lee's statement that she was receiving a full new car warranty. Yet the evidence indicates that the basic warranty on her car had expired; thus, the promises of a full warranty could not have been fulfilled. Ogden also misrepresented the price of the car and failed to disclose the manufacturer's suggested retail price so that Ciampi unwittingly would pay more for the car. Since these acts violated the Consumer Fraud Act, we affirm the trial court's judgment on this count.

We now analyze the propriety of compensatory damages awarded to Ciampi. As stated previously, Ciampi was awarded $5,000 total in compensatory damages on the common-law fraud count and the Consumer Fraud Act claim. Ogden notes that Ciampi's interrogatory which requested a list of her expenses or liability incurred stated: "[m]ortgage delayed because of credit report, $40 trunk lock, attorneys [*sic*] fees." Ogden argues that Ciampi did not prove these damages and, moreover, that she drove the car two years without making any payments.

Ciampi contends that Ogden waived this argument since it never claimed a setoff in the trial proceedings. (*Vieweg v. Friedman* (1988), 173 Ill. App. 3d 471, 474 (defendant must include a request for setoff as part of its pleadings).) However, we believe Ogden raises this point to demonstrate that Ciampi suffered little or no damage in connection with the purchase of the LeBaron.

■ Ciampi's experts testified that she was overcharged by Ogden. Wascher opined that a 1988 LeBaron with over 13,000 miles in September 1988 would have a retail value of approximately $11,700 and that Ciampi was overcharged $3,600. Weissberg testified as to his belief that Ciampi was overcharged $3,000 to $4,000. His opinion was that the value of the LeBaron in September 1988 would have been approximately $10,500. The evidence indicates that Ogden received $10,597.66, plus the $1,000 rebate, plus the $3,800 for the Honda for a total of $15,397.66, which is the amount indicated on the buyer's order. The evidence also indicates that Ciampi was charged twice for the $425 destination charge. We believe the jury had sufficient evidence to determine compensatory damages in the amount of $5,000 and that the trial court did not err in awarding this amount.

Ogden next contends that the punitive damages awarded were improper and excessive. The jury awarded $100,000 in punitive damages on the common-law fraud count. Ogden claims this amount is duplicative of the statutory treble damages of $1,500 awarded under the odometer statute. We reject Ciampi's claim that Ogden has waived its arguments as to the punitive damages by failing adequately to present the argument in its post-trial motion.

Punitive damages are only to be awarded for conduct that is outrageous either because the defendant's motive was evil or the acts exhibited a reckless disregard toward the rights of others. (*Totz*, 236 Ill. App. 3d at 909.) The purpose of awarding punitive damages is to punish the wrongdoer and in doing so deter that party and others from committing similar wrongful acts. (*Totz*, 236 Ill. App. 3d at 909.) Punitive damages are not favored in the law; thus, courts must take caution to ensure that such damages are not improperly or unwisely awarded. *Kleidon v. Rizza Chevrolet, Inc.* (1988), 173 Ill. App. 3d 116, 121.

■ We first note that the punitive damage award was not duplicative of the $1,500 awarded as treble damages. While it is true that a plaintiff may not recover both punitive damages and statutory treble damages, this rule applies where such damages are assessed for the same act, since it is therefore an impermissible double recovery or excessive penalty. (See *Verdonck v. Scopes* (1992), 226 Ill. App. 3d 484, 491.) Here, the $1,500 in treble damages was assessed

for the violation of the odometer statute and the $100,000 amount was assessed for other violations under the common-law fraud count; thus, no double recovery occurred.

We conclude that punitive damages were appropriate, given Ogden's reckless disregard of Ciampi's rights. The jury could find that Ogden encouraged Ciampi's purchase of the LeBaron but deliberately did not tell her the manufacturer's suggested retail price, despite her requests, so that they could charge her a higher price. Ogden was not forthcoming about the price of the car, the expired warranty, or the fact that the car had been driven over 13,000 miles. Mark Koloseike explained that the Honda was really only worth $1,800 but that Ogden credited Ciampi $3,800 so she could get financing. The jury could find this explanation simply unbelievable.

We also conclude that the amount of punitive damages is not excessive. Relevant circumstances in reviewing an award of punitive damages include, among other things, the nature and the enormity of the wrong, the financial status of the defendant, and the potential liability of the defendant. (*Black v. Iovino* (1991), 219 Ill. App. 3d 378, 393.) Each case must be carefully examined in light of the specific facts presented, and the ultimate decision should be governed by the circumstances of each individual case. (*Deal v. Byford* (1989), 127 Ill. 2d 192, 204.) Accordingly, we are not persuaded by Ogden's attempts to compare punitive damage awards in "similar" cases.

As to the nature and enormity of the wrong, Ogden's statements were clearly intended to induce Ciampi to purchase the LeBaron at a price considerably more than the car's worth. Ciampi paid even more for the LeBaron than the manufacturer's suggested retail price for the vehicle without 13,000 miles of usage. We conclude that the award of $100,000 is both appropriate and proportionate to the nature and the enormity of the wrong.

The financial status of the defendant is important and relevant because an amount sufficient to punish or deter one individual may be trivial to another. (*Black*, 219 Ill. App. 3d at 394.) "[T]he amount of the award should send a message loud enough to be heard but not so loud as to deafen the listener." (*Hazelwood v. Illinois Central Gulf R.R.* (1983), 114 Ill. App. 3d 703, 713.) We believe the award here was sufficient to punish Ogden for its conduct and to deter it and others from similar conduct in their future transactions with customers. Therefore, we affirm the award of punitive damages.

Ogden last contends that the award of attorney fees was improper. Ciampi's counsel filed a fee petition requesting attorney fees and costs incurred throughout the case in the amount of $35,075. Ogden alleged that the fee petition contained a barely legible journal

of time entries which failed to explain a differentiation between the charge of $175 court time and $150 noncourt time. Ogden also argues that none of the time spent is delineated to show that it was spent specifically on the fraud count or the odometer count.

Section 10a(c) of the Consumer Fraud Act (815 ILCS 505/10a(c) (West 1992)) provides that the trial court may award attorney fees to the prevailing party. (815 ILCS 505/10a(c) (West 1992).) The decision whether attorney fees should be awarded to the prevailing party under the Consumer Fraud Act rests within the sound discretion of the trial court. (*Ekl v. Knecht* (1991), 223 Ill. App. 3d 234, 245.) The trial court here found the fee petition to be sufficient and assessed attorney fees and costs against Ogden in the amount of $35,075 to be offset against the punitive damages awarded on the common-law fraud count.

Ogden alleges the trial court was misled into awarding full attorney fees regardless of any delineation as to specific counts. Ogden notes that this case was originally brought against Chrysler, Peerless, and Ogden. The count against Peerless was an action for the revocation of the retail installment contract. Peerless filed a counterclaim and extensive pleadings and discovery were conducted. Thus, Ogden contends, a considerable amount of time tabulated in the attorney fees involved matters which did not even concern Ogden.

The most important factor in determining whether fees are reasonable is the amount of time necessarily spent on the case. (*In re Marriage of Malec* (1990), 205 Ill. App. 3d 273, 285.) The time charged for must have been necessary to handle the matter involved. (*Malec*, 205 Ill. App. 3d at 285.) Given the complexities of litigating Ciampi's claims against Ogden, Chrysler, and Peerless, as well as the materiality of these issues as to all three defendants, we conclude the trial court did not err in finding Ogden to be responsible for attorney fees incurred throughout this case.

Ogden further contends that this court specifically ruled in *Roche* that an attorney must differentiate which part of his work was performed on each issue:

> "In the instant case, plaintiff filed an action under both common-law conversion and the Consumer Fraud Act (Ill. Rev. Stat. 1989, ch. 121¹/₂, par. 261 *et seq.*). Plaintiff's petition for fees and the accompanying time slips as well as the testimony presented by plaintiff's attorney at the hearing on the petition failed to differentiate what part of plaintiff's attorney's work was spent on the statutory fraud issue. We note that *** time spent on a consumer fraud count must be specifically delineated where a

prevailing party petitions for attorney fees under the Consumer Fraud Act." *Roche*, 235 Ill. App. 3d at 87.

We agree with Ciampi's argument that the fraud claims and the odometer claim were based on the same evidence and the time spent on each issue could not be distinguished.

We believe the fee petition provided sufficient information as to the reasonableness of the fees. (See *Kaiser v. MEPC American Properties, Inc.* (1987), 164 Ill. App. 3d 978, 984.) The time entries were sufficiently detailed and legible. In addition, Ciampi's counsel testified as to the content of the petition and correctly distinguished between time spent in court and time spent elsewhere since court time was billed at a higher rate. (See *In re Marriage of Yakin* (1982), 107 Ill. App. 3d 1103, 1120.) Accordingly, we affirm the trial court's award of attorney fees.

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

INGLIS, P.J., and BOWMAN, J., concur.